BARKSDALE *v.* CARR.

5-2767                                                   361 S. W. 2d 550

Opinion delivered October 22, 1962.

[Rehearing denied November 26, 1962.]

*Davis & Ragsdale,* for appellant.

*Brown & Compton,* for appellee.

Ed. F. McFaddin, Associate Justice. The Chancery Court held that the appellees had established, by the required *quantum* of evidence, a contract of September 26, 1945, between R. A. Carr and his wife, Sarah Ellen Carr, that they would make irrevocable reciprocal wills, and appellants challenge that finding and decree insofar as concerns the matter of irrevocability.

In 1925 R. A. Carr, a widower with three children, married Mrs. Sarah Ellen Barksdale, a widow with three children. There were no children born to the 1925 marriage, but it was a happy and successful one, and each parent treated the six children with equal love and affection. Mr. and Mrs. Carr acquired a taxicab business as partners; they owned their home by entirety; and among other assets, there was a joint bank account. On September 26, 1945, Mr. and Mrs. Carr went to the office of their attorney, Hon. Surrey E. Gilliam in El Dorado, and executed their separate reciprocal wills,[1] whereby

---

[1] Mr. Carr's will reads: "STATE OF ARKANSAS, COUNTY OF UNION. LAST WILL AND TESTAMENT OF R. A. CARR.

"KNOW ALL MEN BY THESE PRESENTS, That I, R. A. Carr, of the City of El Dorado, County of Union and State of Arkansas, being in good health, of sound and disposing mind and memory, and being above the age of twenty-one years, do make and publish this my last will and testament, hereby revoking all wills by me at any time heretofore made.

"FIRST: I direct that all my just debts shall be paid, and that the legacies hereinafter given shall, after the payment of my debts, be paid out of my estate.

"SECOND: I give to each of my children, Leon Carr, Belton Carr and William Carr, and to each of the children of my beloved wife, Ellen Carr, by a former marriage, that is, Coy Barksdale, Collie Barksdale and Ola Barksdale Wallace, the Sum of One Dollar each, to be paid to them as soon after my decease as conveniently may be done.

each spouse named the other as beneficiary, and then treated all six children equally. Mrs. Carr's will was identical in wording with Mr. Carr's will, except that she left everything to Mr. Carr and named him in each place in her will where he had named her. Each will was witnessed by Mr. Gilliam and his secretary, Miss Jewell Carroll, and the original wills, both in the same envelope, were left with Mr. Gilliam, who also had unsigned copies in his files; and the unsigned copies are brought into the present record by stipulation.

"THIRD: I give, devise, and bequeath to my beloved wife, Ellen Carr, all the rest and residue of my estate, real, personal and mixed, wherever the same may be situated or located, for and during her natural life, with the right, power and privilege, however, during her natural life, to use, expend, sell and hypothecate any and all of the same, and to execute valid and proper deeds, mortgages, conveyances or leases therefor, to the same full purpose and effect as though she owned the full fee or absolute interest in said property, without any interference from any of my said children during her natural life, and with full power and authority during her natural life to handle and carry on the business in which I am now engaged, as though said property belong to her absolutely.

"FOURTH: I give, devise and bequeath, in equal shares and portions, after the death of my said beloved wife, Ellen Carr, or in the event the said Ellen Carr shall not survive me, absolutely and in fee simple all my property, real, personal and mixed, and of any nature and kind, wherever the same may be situated, and located, which shall not have been used, expended, sold or otherwise disposed of, by my said beloved wife, Ellen Carr, in her lifetime to the following in equal shares and portions, to-wit: Leon Carr, Belton Carr, William Carr, Coy Barksdale, Collie Barksdale, and Ola Barksdale Wallace.

"And in the event of the death without issue of any of said devisees prior to the death of the said Ellen Carr, his or her share shall go to the remaining devisees above named in equal shares; and in the event that any of the above named devisees shall not survive the said Ellen Carr, but shall at her death leave direct descendant or descendants, the said direct descendant or descendants shall receive, in equal shares among themselves, the share and portion of his, her, or their said respective father or mother, as the case may be.

"FIFTH: I do hereby appoint and constitute Ellen Carr as sole executrix of this my last will and testament, to serve as such without bond.

"IN WITNESS WHEREOF, I have hereunto set my hand this the 26 day of September, 1945, in the presence of Surrey E. Gilliam and Jewell Carroll who attest the same at my request.

"R. A. Carr, Testator.

"The above instrument was now here subscribed by R. A. Carr, the testator, in our presence; and we, at his request and in his presence, and in the presence of each other, sign our names hereto as attesting witnesses, and at the time of our signing said testator declared said instrument to be his last will and testament.

"S. E. Gilliam
"Jewell Carroll"

Mr. Carr died in El Dorado on April 23, 1959. When Mr. Gilliam died on May 1, 1959, his files were delivered to Mr. Crumpler; and on or about May 22, 1959, Mrs. Carr sent her son, Mr. Collie Barksdale, to Mr. Crumpler for the original wills, both of which were delivered to Mr. Barksdale in the same envelope, just as they had been in Mr. Gilliam's possession through all the years. Mrs. Carr probated Mr. Carr's will, became the executrix, and took under said will.

On November 1, 1959, Mrs. Carr revoked her will by burning it; on December 18, 1959 she conveyed the home place to her son, Collie Barksdale; in December she conveyed the farm lands to the three Barksdale children; and she had her bank account made to herself and/or Collie Barksdale. On January 13, 1960, Mrs. Carr conveyed her automobile to her daughter, Ola Barksdale Wallace; and on January 14, 1960 Mrs. Carr departed this life intestate. The consideration for the said conveyances executed by Mrs. Carr to the Barksdale children was testified to be $10.00 in each instance, or a total of $30.00, which is certainly nominal for property worth in excess of $15,000 or $20,000. Dr. Wharton testified that she was mentally competent at all times.

In due time after Mrs. Carr's demise, the three Carr children filed this suit in Chancery Court against the three Barksdale children, claiming that when Mr. and Mrs. Carr made their wills in 1945 they made a contract for irrevocable reciprocal wills; that Mrs. Carr, having taken under one will could not destroy her own will thereafter; that Mrs. Carr breached the contract by destroying her will; and that her conveyances to the Barksdale children were not *bona fide*. The complaint prayed that the Barksdale children be ordered to convey to the Carr children one-half of all the properties that Mrs. Carr owned prior to making the conveyances beginning in December, 1959.

The Barksdale children moved that Robert B. Wallace, administrator of the estate of Mrs. Sarah Ellen Carr, be made a defendant along with them, since said

administrator had title to assets of the estate of Mrs. Carr. This motion was granted, and Wallace, Administrator became a party defendant. For answer, the defendants denied, *inter alia,* that R. A. Carr and Sarah Ellen Carr made any contract against revocation of their wills. The Chancery Court, after hearing the evidence, held that when Mr. and Mrs. Carr made their wills[2] in September, 1945, they made a contract that neither will could be revoked. The Court awarded the Carr children (plaintiffs) the prayed relief; and the Barksdale children* and Mrs. Carr's administrator (defendants) have appealed.

I. *The Dead Man's Statute.* In the trial of the case the defendants objected to any evidence by any of the Carr children (plaintiffs) as to anything Mrs. Carr may have said to them about the alleged contract. This objection was because of the "Dead Man's Statute," which is found in "Schedule" § 2 to the Arkansas Constitution; and the germane portion reads:

"In actions by or against . . . administrators . . . in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transactions with or statements of the . . . intestate . . . unless called to testify thereto by the opposite party."

The Trial Court correctly ruled that the "Dead Man's Statute" was applicable to the proffered evidence by the Carr children. See *Alphin* v. *Alphin,* 225 Ark. 122, 279 S. W. 2d 822; *Morris* v. *Arrington,* 215 Ark. 564, 221 S. W. 2d 406; and *Umberger* v. *Westmoreland,* 218 Ark. 632, 238 S. W. 2d 495.

---

[2] We have several comparatively recent cases that are worthy of study in connection with some of the problems presented in this case. We mention these: *George* v. *Smith,* 216 Ark. 896, 227 S. W. 2d 952; *Janes* v. *Rogers,* 224 Ark. 116, 271 S. W. 2d 930; *Allen* v. *First National Bank,* 230 Ark. 201, 321 S. W. 2d 720; and *Robinson* v. *Williams,* 231 Ark. 166, 328 S. W. 2d 494.

* While the case was pending in this Court, Mrs. Ola Barksdale Wallace died intestate, and proper orders have been made reviving the cause as to her husband and heirs, all of whom are of full age.

II. *Declarations of Mr. Carr.* Likewise, in every instance in which the Carr children sought to prove that their father had made any statements to anyone—in the absence of Mrs. Carr—concerning any alleged contract against revocation of the wills, there was a prompt objection to such testimony as incompetent. Such objection was well made, because one party to an alleged contract cannot bind the other party by declarations made in the absence of the other party. *Central Coal Co.* v. *John Henry Shoe Co.,* 69 Ark. 302, 63 S. W. 49; *Beasley Lbr. Co.* v. *Sparks,* 169 Ark. 640, 276 S. W. 582; and *Rouw* v. *Arts,* 174 Ark. 79, 294 S. W. 993.

III. *The Burden On The Plaintiffs.* With the excluded evidence thus mentioned, the next vital point is the burden that rested on the plaintiffs to prove the contract prohibiting the revocation of Mrs. Carr's will. No language in either will stated or indicated that there was a contract against revocation. The mere proof of the making of identical or reciprocal wills[3] does not, *ipso facto,* establish a contract against subsequent revocation by either one of the makers. If the Carr children are to win, they must prove a contract against the revocation of Mrs. Carr's will just as they would have to prove a contract to make a will; and our cases hold that such a contract must be proved by evidence that is clear, cogent, and convincing. *Crews* v. *Crews,* 212 Ark. 734, 207 S. W. 2d 606. In *Janes* v. *Rogers,* 224 Ark. 116, 271 S. W. 2d 930, we had a set of facts very similar to those presented in the case at bar; and the question there posed was whether a contract to make irrevocable reciprocal wills had been established. There, as here, the written instrument contained no specific provision recognizing the contract; and Mr. Justice MILLWEE, speaking for this Court, said:

---

[3] Some cases have not made any definite distinction between "joint", "mutual", or "reciprocal" wills. There is an annotation in 169 A.L.R., page 9, entitled "Joint, mutual, and reciprocal wills," and on pages 11 to 14 of the volume there is a discussion of definitions and distinctions. The mere fact that two parties executed separate wills reciprocal in terms—as here—does not *ipso facto* prove a contract that the wills were to be irrevocable. See Page 23 of said annotation.

"The principal contention for reversal is that the proof is insufficient to establish a valid contract to make reciprocal wills. In considering this contention we deem it appropriate to notice certain general principles applicable to a proper solution of the issues. We have repeatedly held that a valid oral contract to devise or convey real estate may be made, which is enforceable in equity. *Williams* v. *Williams,* 128 Ark. 1, 193 S. W. 82; *Speck* v. *Dodson,* 178 Ark. 549, 11 S. W. 2d 456. We have also held that the proof to establish such contract must be clear and convincing. *Crews* v. *Crews,* 212 Ark. 734, 207 S. W. 2d 606. The same degree of proof is required to establish a contract for the execution of wills containing reciprocal bequests of a life estate to the surviving testator with remainder to third persons designated by the contract. 57 Am. Jur., Wills, Sec. 728.

"It is also well settled that a will is generally ambulatory until the death of the testator, and that mutual or reciprocal wills, may be revoked at pleasure unless founded on, or embodying, a binding contract. 69 C. J. Wills, Sec. 2719. . . .

"The fact that the parties have concurrently executed separate wills, reciprocal in terms, is not sufficient, of itself, to show that the parties had entered into a contract to make such wills; but the terms of such wills afford some evidence of the contractual relation and, when read in connection with other evidence which tends to show the execution of the contract, may establish that fact. Page on Wills, Sec. 1710; Annotation on Joint, Mutual and Reciprocal Wills, 169 A.L.R. 9."

So we conclude that the burden resting on the Carr children in the case at bar was to establish by evidence that is clear, cogent, and convincing, a contract between Mr. and Mrs. Carr to make irrevocable wills.

IV. *The Competent Evidence In The Case.* In order to recover their full claimed interest in the property in controversy, the Carr children had to prove that Mrs. Carr could not legally revoke her 1945 will. The only competent evidence that we have discovered in the record

before us, even remotely bearing on the matter of the irrevocability of Mrs. Carr's will, is now listed:

(a) Theo Sawyer testified that he knew Mr. and Mrs. Carr; that he was at one time employed by the Yellow Cab Company which they owned; that some time between 1946 and 1950 he had a conversation with Mr. and Mrs. Carr, as it affected their children, and here is what the witness stated Mrs. Carr said:

"At the time, William Carr was living in one of their houses over on East First and for some months he had not paid the rent on it and she made the statement that in their will, each child, or if any owed any money, it would be divided equal and what each one owed would be deducted."

(b) The other witness was Carlos Cole. He testified that he had worked for the Yellow Cab Company; and he testified as to what Mr. Carr said in about 1957, when we infer Mrs. Carr was present:

"Q. State to the Court whether or not you had a conversation with Mr. R. A. Carr or was present when he made a statement with reference to his will and Mrs. Carr's will, both of them?

"A. Yes, sir, he did not say it to me exactly, but to the bunch that was sitting around.

"Q. All right, what was the occasion of that statement being made?

"A. Well, I don't know exactly what started it. At first, about some fellow that died and hadn't left a will or something, he figured there might be a big lawsuit and he just made the remark, he said, well, he said— . . . He just made the remark, said there wouldn't be nothing like that happen when he and his wife, that they had everything fixed like they wanted it, one of their heirs wouldn't get any more than the other one, and he just turned around and walked off."

The testimony of the witness Sawyer, at most, shows that some time between 1945 and 1950 Mr. and Mrs. Carr

intended that all the children be treated equally; but such intention does not establish a contract that would prevent the will of Mrs. Carr from being revoked by her. Likewise, the testimony of the witness Cole, as to what Mr. Carr said—even assuming Mrs. Carr to have been present at the time—merely showed that several years before Mr. Carr's death he had said that the six children would take equally. There is nothing to show that such intentions were beyond revocation.

In short, the testimony of Sawyer and Cole—and there is no other in the record on this point—along with the wills themselves, fail to be that "clear, cogent, and convincing evidence"[4] which is required in a case such as this; and we, therefore, conclude that the Carr children failed to offer the *quantum* of evidence required to establish their case and that the decree must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

V. *Other Matters.* In the briefs there is considerable argument as to whether the deeds from Mrs. Carr to her children were *bona fide* and with valuable consideration. That question passes out of the case, because, since Mrs. Carr had a right to revoke her will, she had a right to give to whomsoever she desired the property she had received by entirety as well as any property she acquired other than by Mr. Carr's will. Of course, any property she received solely through Mr. Carr's will, and not disposed of by her, would be governed by the terms of Mr. Carr's will. We remand the case so that as to such property, the Chancery Court may make appropriate orders.

[4] As to what is "clear and convincing evidence," we like the language used by the Supreme Court of Utah in *Kirchgestner* v. *Denver*, 233 P. 2d 699, wherein the Court quoted from its own case of *Greener* v. *Greener*, 212 P. 2d 194: " '. . . . for a matter to be clear and convincing to a particular mind it must at least have reached the point where there remains no serious or substantial doubt as to the correctness of the conclusion. A mind which was of the opinion that it was convinced and yet which entertained, not a slight, but a reasonable doubt as to the correctness of its conclusion, would seem to be in a state of confusion. . . . That proof is convincing which carries with it, not only the power to persuade the mind as to the probable truth or correctness of the fact it purports to prove, but has the element of clinching such truth or correctness. Clear and convincing proof clinches what might be otherwise only probable to the mind.' "